# TEXAS COURT OF APPEALS REPORTS.

## GALVESTON TERM, 1892

30 601
31 554

### LINDSEY ELLIS v. THE STATE.

#### No. 3330.    Decided January 20.

1. **Murder—Continuance—Threats.**—On a trial for murder, where the application for continuance was based on the testimony of absent witnesses to prove threats on the part of deceased against defendant, *held*, in view of the other evidence in the case, which failed to show that at the time of the killing deceased was doing any act manifesting an intention to execute any threats he may have made, that the court did did not err in overruling the application for continuance.

2. **Same—New Trial — Practice in Court of Appeals.** — This court will not revise the action of a trial court in refusing a new trial because of its previous refusal of a continuance, unless it be made to appear not merely that the accused might probably have been prejudiced by such ruling, but that it is reasonably probable that had the absent testimony been before the jury a verdict more favorable to the defendant would have resulted.

3. **Charge of Court—Malice, Definition of.**—Where the court charged the jury, "The term malice, used in its legal sense, means the willful and intentional doing of a wrongful act without legal justification or excuse, and is a state or condition of the mind which shows a heart regardless of social duty and fatally bent on mischief, the existence of which is inferred from acts committed or words spoken," *held*, this definition of malice is in strict conformity with approved precedents.

4. **Charge of Court—Burden of Proof—Nonage.**—The principle that the burden of proof in criminal cases is always on the State has relation to the establishment of the *corpus delicti* and the defendant's complicity; but when the defense relies upon distinct substantive matter for exemption or immunity, such as nonage—that is, that the defendant is under 17 years of age, and can not be capitally punished—the burden of proving such matter is on the defendant (Penal Code, art. 51), and the court did not err in so instructing the jury.

5. **Lead Pencil, Verdict Written With.** — While by provisions of article 705 of the Code of Criminal Procedure the verdict is required to be in writing, it is not required that the writing be with pen and ink; and it is no valid objection to a verdict otherwise good that it is written in pencil.

APPEAL from the District Court of Kaufman.    Tried below before Hon. Anson Rainey.

On a trial under an indictment charging him with the murder of one Major Shaw, appellant was convicted of murder in the first degree, the penalty being assessed at death.

The defense was self-defense, based upon threats and reasonable appearances of danger.    Defendant attempted to establish his nonage by

his mother, who testified that he was between 16 and 17 years of age, but whose testimony on cross-examination clearly showed that she did not know the year in which he was born. Other witnesses testified that defendant was about 19 or 20 years old. The main facts of the killing will be seen from the following testimony:

Defendant Lindsey Ellis, in his own behalf, testified: I had been about to marry a certain girl, and was about to run away with her. I was told by Charles Tolbert on the day before the killing that Major Shaw, the deceased, had searched Charles Tolbert's father's house on Sunday (before the killing on Tuesday) for me and the girl I was about to marry, and that the said Major Shaw, deceased, at the time he made the search said that he was going to find me and bring me in, or bring part of me. This was on Monday that Charles Tolbert told me this. Nerva Gibson told me also, on Monday prior to the killing on Tuesday, that Major Shaw, the deceased, had searched her father's house on Sunday, and stated that he was going to find me and bring me in. Late Tuesday evening, about dark, I was going down toward town, and came on by Tom Washington's house. Tom was at the wood-pile, and I asked him to walk on to town with me, and he and I started up the road toward town, and when we got opposite Major Shaw's house I told Tom I wanted to see Major Shaw. I called Major twice, and I told Tom to call him, and Tom called him once. Then he came out and came to the bars and leaned one arm on the post of the bars. The bars were down. Tom had walked off like he was going home, and I asked Major Shaw if he had made the threats, telling what I had heard, and told him I wanted to know what right he had to interfere. He repeated the threat, and came outside of the bars, with one hand drawn back as if to strike me with something, but it was dark and I could not see what he had, and as he stepped out at the bars I told him to stop, and I stepped back seven or eight steps from the post. I again told him to stop, but he kept advancing, and I fired three times. He stepped backward at the first shot, and then was when I fired the other two.

Cross-examined: I got the pistol that day from old man Charles, and had not been home with it. I had pawned it with him sometime before, and just got it out of the pawn that day. I did not load it. I suppose it had the same old load in it. I know I was bound to have hit the deceased the first shot I fired at him. He was coming toward me when I shot, and had come outside the bars, the bars being down at the time. I shot him because I was afraid. He had made these threats and was coming toward me. It was dark, and I was afraid he was going to kill me or hurt me bad. It was to defend myself that I did it. I had no intention to kill him when I went up there, but I had heard these threats and wanted to find out what right he had to interfere with me. After the shooting I went home, and on the way I dropped the pistol in the cotton-patch.

Tom Washington, a witness for the State, in rebuttal, stated, that when defendant fired the first shot deceased was on the inside of the fence in his own yard, and leaning on the fence; that he did not advance on the defendant, and did not make any effort to strike him.

Alexander Shaw, a witness for the State, in rebuttal, stated, that when he got to the house of the deceased he went out to the bars and found them up. Examined the ground, and there were no tracks leading out of the yard through the bars. Right near where the bars joined the fence, on the inside, he found some blood and some tracks. These tracks he traced back to where the deceased fell.

*Dillard & Stroud,* for appellant.

*R. H. Harrison,* Assistant Attorney-General, for the State.

DAVIDSON, JUDGE.—Appellant was convicted of murder in the first degree, and the death penalty assessed, upon an indictment charging him with the killing of one Major Shaw.

Defendant made an application for a continuance for the testimony of several witnesses, two of whom appeared and testified at the trial. By two of the absent witnesses, to-wit, John Hardgrave and Emily Hardgrave, he proposed to prove that he is and always has been a peaceable and quiet citizen; by the absent witness Charles Tolbert, that he (the witness) had heard the deceased, on the day before the killing, say that he (the deceased) expected to find Lindsey Ellis (appellant) and bring him in dead or alive; and further, that this threat of deceased was communicated by Tolbert to him before the alleged killing; and further, that the deceased came to the house of Tolbert's father on the day previous to the killing, and searched said house for the defendant, and at the time of said search he repeated the above named threat, and said that if he (the deceased) should find the defendant he would take him, dead or alive; and these facts were communicated by Tolbert to the defendant before the killing. He also stated in his application for a continuance that he had just learned that he could prove by one Nerva Gibson, who had not been subpœnaed as a witness, that on the day before the killing the deceased had come to her father's house, and searched again for the defendant; that he asked of her, in an angry and threatening manner, where the defendant was; and this was communicated to the defendant before the killing.

The court did not err in overruling the application for a continuance. If such threats were made as were proposed to be proved by the absent witnesses, they could not have availed the defendant anything upon the trial of this case, because the testimony adduced on the trial shows that the deceased was doing nothing which indicated any effort upon his part to execute any threats that he might have made at the

time the defendant sought and killed him.   In order to justify under threats, it must be shown that the deceased, at the time of the killing, by some act then done, indicated a present purpose to execute the threats so made.   Penal Code, art. 608; Willson's Crim. Stats., sec. 1053.

The rule is well settled that this court will not revise the action of the trial court in refusing a new trial because of its previous refusal of a continuance, unless it be made to appear not merely that the accused might probably have been prejudiced by such ruling, but that it is reasonably probable that had the absent testimony been before the jury a verdict more favorable to the defendant would have resulted. Browning v. The State, 26 Texas Ct. App., 432; see, also, Pruitt v. The State, *ante*, p. 156.   In our opinion, even should the proposed absent testimony have been adduced on the trial, it could not and should not have affected the result, but on the contrary would rather have tended to have intensified the motive, animus, and malice of the defendant in killing the deceased under the circumstances attendant upon the killing.

Defendant's second bill of exceptions complains of the charge of the court, in that it failed to define "malice aforethought."   With reference to the definition of the term "malice," the fourth subdivision of the court's charge is as follows:   "The term 'malice' as used in its legal sense means the willful and intentional doing of a wrongful act without legal justification or excuse, and is a state or condition of the mind which shows a heart regardless of social duty and fatally bent on mischief, the existence of which is inferred from acts committed or words spoken."   This definition of "malice" is in strict conformity with approved precedents.   Gallaher v. The State, 28 Texas Ct. App., 247; Willson's Crim. Forms, Nos. 708, 709.

Defendant's third bill of exceptions attacks the eleventh and thirteenth paragraphs of the charge of the court, because in the connection in which said instructions were given the eleventh paragraph limited the reasonable doubt to all the phases of the case, excluding defendant's nonage, and that as to the nonage of the defendant, the thirteenth paragraph of the charge imposed the burden of proof to establish nonage upon the defendant.   These objections to the charge are not well taken.   The principle that the burden of proof in criminal cases is always on the State has relation to the establishment of the *corpus delicti* and the defendant's complicity; but when the defense relies upon distinct substantive matter for exemption or immunity, such as nonage—that is, that the defendant is under 17 years of age and can not be capitally punished—the burden of proving such matter is on the defendant; and the court did not err in so instructing the jury. Ake v. The State, 6 Texas Ct. App., 399; Penal Code, art. 51; Willson's Crim. Stats., secs. 112–114.   We are of opinion that the charge of the

court sufficiently instructed the jury with regard to the reasonable doubt as applicable to the facts in the case. If defendant desired a more explicit presentation of the law with regard to its applicability to the question of nonage, he should have specially requested such an instruction; and having failed to do so, in the light of the testimony as adduced in the record before us, we can not say that there was any likelihood the defendant's rights could in any manner have been prejudiced or injured by the charge as given.

Defendant's fourth bill of exceptions complains of the sufficiency and legality of the verdict of the jury in this, that the verdict was written with a lead pencil and not with pen and ink. Our statute (Code Crim. Proc., art. 705) defining a verdict provides that it must be in writing, but it nowhere requires that it shall be written with pen and ink. With regard to an indictment, Mr. Bishop says it is usually written with ink, and practically it ought to be, but a lead pencil would seem to fulfill the strict requirements of the law, though, if an indictment were wholly written in this way, there is grave reason to believe that the court ought to quash it. 1 Bish. Crim. Proc., sec. 337.

We are of opinion that it is no valid objection to a verdict which is otherwise good that it was written in pencil. In the case of Clason v. Bailey, 14 Johnson, 484, the question as to the validity of an instrument written with a lead pencil is discussed at length; and the court there held the writing to be sufficient and valid. We are of opinion that the objection to the verdict that it was written with lead pencil was not sufficient to affect its validity, and not well taken nor maintainable in law. A verdict in lead pencil is a verdict in writing, under our statute.

The charge of the court sufficiently presented the law applicable to the facts in evidence, and we have found no reversible error in the judgment; therefore it is affirmed.

*Affirmed.*

Judges all present and concurring.